IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SEAN ROWELL,

                      Plaintiff,                      OPINION AND ORDER

   v.

                                                    20-cv-110-wmc

BRANDON DROST,

                      Defendant.

---

Plaintiff Sean Rowell, who is representing himself, claims that a unit manager at Stanley Correctional Institution ("Stanley"), defendant Brandon Drost, retaliated against him for engaging in constitutionally protected speech while imprisoned there. (Dkt. #13.) Rowell also claims that Drost transferred him to a different housing unit at Stanley, negligently exposing him to harassment and mistreatment by other inmates in that unit. (*Id.*) Drost subsequently filed a motion for summary judgment on the merits of plaintiff's claims. (Dkt. #52.) For the following reasons, the court will now grant Drost's motion for summary judgment in part as to Rowell's First Amendment claim, while relinquishing any supplemental jurisdiction over Rowell's remaining state-law negligence claim.[1]

UNDISPUTED FACTS[2]

**A. Background**

Plaintiff Sean Rowell is a resident of Wisconsin. Defendant Brandon Drost is an

---

[1] For this reason, the court need not reach defendant Drost's alternative assertion of qualified immunity from plaintiff's First Amendment claim or discretionary immunity from plaintiff's state-law negligence claim.

[2] Unless otherwise indicated, the following facts are material and undisputed after considering the

employee of the Wisconsin Department of Corrections ("DOC") and works as a unit manager at Stanley. At all times relevant to this case, Rowell was in the custody of the DOC at Stanley.

In May 2019, Rowell submitted a complaint to Stanley's warden pursuant to the federal Prison Rape Elimination Act ("PREA"), reporting multiple incidents of sexual conduct with a former social worker at Stanley. In his role as a unit manager, Drost receives notices of PREA complaints when initiated and upon conclusion. On May 11, 2019, Drost was informed of Rowell's PREA complaint, but he was neither involved in the investigation of that complaint, nor in the review of any documents related to it.

Housing decisions at Stanley are made by prison staff members and consider larger penological interests, as well as an individual inmate's needs or restrictions. At times, prison staff at Stanley make housing decisions with the input of the facility's Multi-Disciplinary Team ("M-Team"), which is a committee that meets weekly and addresses inmate conduct reports, incident reports, and other areas of concern. The M-Team's meetings are recorded in written minutes. In his role as a unit manager, Drost generally attends every M-Team meeting.

Similarly, inmates at Stanley can hold jobs in their prison units, which have an allotment of job assignments based on the unit's needs. As the manager of Unit 5, Drost was responsible for offering and assigning inmate jobs within the unit.

---

parties' proposed factual findings, responses, and the evidence of record in a light most favorable to plaintiff. *See Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014) ("We must . . . construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true.").

### B. Rowell's August 7, 2019 Housing Unit Transfer

Rowell was moved between housing units at Stanley on several occasions in 2019. Initially, he was transferred from Unit 3 to Unit 1 on March 12, 2019. Rowell was housed in Unit 1 because of his positive attitude and adjustment at Stanley.

However, in an M-Team meeting held on August 6, 2019, prison staff, including Drost, discussed a disciplinary issue between two inmates in Unit 5 who were reportedly "feeding off each other in regards to their health conditions." (Drost Decl. (dkt. #56) ¶ 26.) In particular, one of the inmates had threatened to hit the other with his cane. Shortly after that M-Team meeting, another unit manager, Heidi Mellenberger, also sent an email to Drost and other unit managers at Stanley reporting that Rowell had been making "inappropriate gestures" towards a female staff member in Unit 1 and requesting he be moved. Mellenberger also identified Rowell as the inmate who had previously bought gifts for a female social worker in Unit 1. (Exhibit 510-1, Dkt. #56-3.) The latter involved the same social worker with whom Rowell had previously engaged in an inappropriate relationship and against whom he had filed his May 2019 PREA complaint. Although Mellenberger referenced that social worker by name, she did *not* mention Rowell's PREA complaint in the email. In a subsequent email to Drost still that same day, another unit manager again raised a Unit 5 inmate conduct issue.[3]

---

[3] Rowell disputes that the inmates discussed in the follow-up email to Drost are the same ones who were discussed at the M-Team meeting. (Dkt. #74, at 11.) Because the M-Team meeting minutes are redacted, it is unclear whether Rowell's contention has merit. (M-Team Meeting Minutes (dkt. #56-2) 1.) However, even if correct, and Rowell had initially been swapped for other inmates, there is still no dispute of *material* fact that would defeat defendant's motion for summary judgment.

3

Because of the concerns regarding Rowell's presence in Unit 1 and the other inmates in Unit 5, Drost felt that the best potential solution was to swap Rowell with one of the inmates in conflict on Unit 5. In part, unlike Unit 1, Unit 5 also had a male social worker. Later that same afternoon, Drost emailed Mellenberger and other prison staff to propose that Rowell be moved to Unit 5 and offered to facilitate that move. Drost ordered Rowell's move to Unit 5 the very next day, on August 7, 2019, exchanging him for the inmate who had threatened to hit his cellmate with a cane.

More specifically, Rowell was assigned to the B-Wing of Unit 5, which is generally reserved for inmates who are veterans and need access to external, veteran-designated services, although non-veteran inmates can also be housed in the B-Wing of Unit 5. Indeed, if assigned there, non-veterans have the same opportunities -- including employment and programming -- as veteran inmates. Because there were not enough veterans at Stanley to fill beds in the B-Wing, Drost sought to fill the remaining open beds with inmates, like Rowell, who displayed positive adjustment to the facility.

After Rowell was moved to Unit 5, he asked Drost why he had been moved. Drost informed Rowell that he had been moved due to a security issue. However, Rowell contends that another correctional officer informed him that he had been instructed to fire Rowell from his inmate job in Unit 1 and to transfer him to Unit 5. (Rowell Decl. (dkt. #60) ¶ 4.) On August 15, 2019, therefore, Rowell filed an inmate complaint alleging that Drost's decision to move him to Unit 5 was retaliation for filing his PREA complaint. (Dkt. #27-2.)

### C. Inmate Employment at Stanley

Upon moving to Unit 5, Rowell spoke with Drost about his interest in a job in Unit 5. Drost told Rowell that he would remain in his original pay status after the move and he would work with Rowell to find a job in the unit. If Rowell had not been interested in a job in Unit 5, his original pay status would not have carried over, and he would have been placed on involuntary assigned status ("INUVA") with a lower pay rate for jobless inmates. However, by the time Rowell had arrived on Unit 5, most of the available inmate jobs had already been filled.

According to Drost, after he and Rowell discussed job options in Unit 5, Drost offered Rowell a job as a laundry worker, which was one of the few openings at the time. Although open jobs are not formally listed, they are usually posted in the unit for three days after becoming available, and the unit manager or responsible staff member selects the best candidate from the applicant pool. Here, because Rowell was previously employed in Unit 1, Drost offered him the open laundry position, which had the same pay rate as his previous job. According to Drost, Rowell also accepted the laundry position and did not ask any questions or voice any concerns about the position.

In contrast, Rowell purports to dispute that any discussion about his employment in Unit 5 ever took place, although in his deposition, even he concedes after a conversation on August 8, 2019, Drost may have directed him to a list of available jobs, then assigned him to work in the prison laundry without his input. (Dkt. #75, at 3 (citing Sims Decl.

5

(dkt. #61)) 1); (Rowell Dep. (dkt. #53) 27-32.)[4] In turn, Drost suggests that he gave Rowell the laundry position to ensure that Rowell avoided being placed on INUVA status, per his request. (Dkt. #75, at 3.)

After Rowell took the laundry position in Unit 5, he reported a concern to Drost about another inmate. Specifically, Rowell claims the inmate initiated a campaign to label him as a "snitch," due to his favorable move to Unit 5's B-Wing and favorable employment as a laundry worker in a position intended for veterans. As a result, Rowell felt that his safety was at risk, which reportedly caused him psychological distress. However, the laundry positions in Unit 5 were not reserved for any specific group of inmates, and Drost spoke with the inmate Rowell identified, who denied having any "agenda, concerns or issues" with other inmates in the wing. (Drost Decl. (dkt. #56) ¶ 72.) Drost also spoke with 10 to 15 other inmates about Rowell's allegations of being unfairly labeled a snitch, although none of them substantiated his claim. (*Id*.) In turn, Rowell claims that another inmate tried to intervene on his behalf when others labeled him as a "snitch," but was "unable to reason with them." (Dkt. #75, at 4.)

On September 22, 2019, Rowell was promoted from the Housing Unit Worker 1 laundry position to a Housing Unit Worker 3 laundry position, which held a higher pay rate, though it lacked supervisory responsibilities. This change in job assignment was a standard practice for inmates with laundry positions, and Rowell had been exhibiting

---

[4] In his declaration, a non-party, Stanley inmate Michael Sims, further represents that Drost told him he "promised" Rowell a job and that the vacant laundry position would be filled by Rowell. (Dkt. #61.)

positive adjustment to the B-Wing and doing his job well. Although Drost states that Rowell accepted the new job assignment willingly and did not raise any concerns about it, Rowell claims that he instead accepted the assignment "under duress."[5] (Dkt. #75, at 5.) However, Rowell does not dispute that he was interested in maintaining employment during his move to Unit 5. Still, Rowell filed a complaint alleging that the other inmate in Unit 5 caused him psychological distress by labeling him as a "snitch" on September 27, 2019. (Dkt. #27-3, at 2.)

### D. Inmate Reclassification Hearings

Inmates at Stanley are also entitled to participate in an annual "reclassification" process that ensures regular review of an inmate's custodial status at DOC facilities. Reclassification hearings are conducted by a three-person committee that determines if an inmate satisfies the requirements for certain program needs, assignments, or institution placements. The hearing dates and committee membership of each reclassification panel are set at the beginning of each month, and several reclassification hearings can take place on the same day.

Before a reclassification hearing, inmates meet with a social worker, who in turn makes a recommendation to the committee based on factors including the inmate's offense history, conduct report history, health classifications, and program information. The inmate can also appear in person at his or her reclassification hearing and discuss the social

---

[5] At his deposition, Rowell defined duress as "being moved[,]" "being put in a position where [he] didn't ask for [the job,]" or being "housed on a unit and not working and not receiving [any] income [ . . . ] so [he] take[s] the job[.]" (Rowell Dep. (dkt. #53) 33.)

worker's recommendation to move or retain the inmate at their current institution. Any comments that an inmate makes during his reclassification hearing are documented. The committee's final recommendation must be unanimous, and if the committee recommends that an inmate be moved, the final recommendation is approved or denied by a classification sector chief or a classification specialist at the DOC's Bureau of Offender Classification and Movement.

On August 12, 2019, Rowell met with a social worker at Stanley for his pre-hearing interview, where he requested a lateral transfer to Racine Correctional Institution for him to participate in vocational programming there.[6]  Four days later, the social worker recommended that Rowell remain at Stanley.

Rowell's scheduled reclassification hearing took place on September 26, 2019. Because one of the three panel members originally assigned to Rowell's hearing had to leave Stanley early that day, Drost offered to cover for her. Although Drost's name did not appear on the report summarizing Rowell's September 26, 2019, reclassification hearing, it is undisputed that he sat on the panel. Rowell contends that he objected to Drost's presence on the panel when he learned about it. (Rowell Decl. (dkt. #66) ¶ 7.) However, Drost maintains that he would not have participated in the hearing had Rowell objected at the time. (Drost Decl. (dkt. #56) ¶ 113.) Moreover, Rowell alleges generally that Drost "orchestrate[d] a 'conspiracy of retaliation'" against him at the hearing. (Dkt. #75, at 6.)

---

[6] Several days earlier, Rowell was allegedly "[making] inappropriate gestures" towards the social worker who conducted his pre-hearing interview. (Exhibit 510-1, Dkt. #56-3.) Rowell denies having done so, and he claims that he actually "went in front of" another social worker instead of the social worker who completed his evaluation. (Dkt. #74, at 35.)

At the hearing's conclusion, the committee members unanimously denied Rowell's transfer request and recommended that he remain in custody at Stanley, citing: the social worker's recommendation; Rowell's time left to serve on his sentence; his programs status; offense history; and positive institutional adjustment. The committee further explained its rationale to Rowell and encouraged him to maintain his positive adjustment at Stanley. Because the committee recommended retaining Rowell at Stanley, its recommendation was automatically approved on October 1, 2019.

On October 3, 2019, Rowell requested an administrative review of the panel's classification decision, contending that the hearing was not conducted fairly or impartially because Drost had participated on the panel, and Rowell had two pending inmate complaints against him. (Dkt. #28-3, at 2.) The administrative review revealed that the report from Rowell's September 26, 2019, reclassification hearing incorrectly listed the committee member who Drost replaced as having attended and omitted Drost's participation altogether. On January 24, 2020, an addendum was then added to the report explaining that Rowell was entitled to a further hearing based on the data entry error.[7]

However, the subsequent administrative review did not dispute the reclassification hearing committee's decision to keep Rowell at Stanley. Finally, on March 26, 2020, Rowell was given another reclassification hearing *without* Drost, but the committee again unanimously agreed to keep Rowell at Stanley.

---

[7] Rowell also claims that the fact Drost's presence was listed on the final recommendation documents for an inmate whose hearing was after his is further evidence of a conspiracy Drost orchestrated against him. (Dkt. #75, at 6.)

9

### E. Inmate Phone and Mail Supervision

In the wake of his PREA complaint, Rowell also claims that he was subjected to enhanced monitoring of his phone calls and mail.[8] Specifically, he alleges that a non-defendant, a DOC sergeant, told another inmate that she did not want to be seen as an "accomplice" when authorizing the inmate to give Rowell a phone number. (Dkt. #75, at 4 (citing Baldwin Decl. (dkt. #62) 1).) Regardless, *all* inmate phone usage, except for approved and authorized attorney-client calls, is monitored and recorded at Stanley, and Rowell signed an acknowledgment of his being informed of this practice. According to Drost, there is no separate or more restrictive phone monitoring list at Stanley, and Rowell was subject to the same level of phone supervision as other inmates.

## OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (7th Cir. 2009), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). As to the latter, the nonmovant must do more than simply show that there is "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*

---

[8] Plaintiff was not granted leave to proceed on a claim of retaliation based on enhanced mail monitoring or diversion. (Dkt. #13, at 7-8.) However, the court will analyze his claim in the broader context of his phone monitoring claim on which he was granted leave to proceed.

*Corp.*, 475 U.S. 574, 586 (1986). Rather, he must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish there is a genuine triable issue. *Id*. Further, because evidence must be admissible at trial, hearsay, speculation, or conclusory allegations cannot defeat summary judgment. *Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023); *Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999).

Here, plaintiff claims that defendant engaged in a course of retaliatory conduct after he filed a PREA complaint against another employee at Stanley, then later a series of inmate complaints against defendant. Specifically, plaintiff contends that in response to his exercise of speech protected under the First Amendment, defendant (1) moved him to a different housing unit where he was forced to take a new prison job and faced animosity from other inmates, (2) joined a committee to ensure the denial of his transfer to another institution, and (3) subjected him to enhanced prison phone and mail monitoring. Plaintiff also alleges that defendant was negligent in transferring him to a different housing unit at Stanley and in exposing him to harassment or mistreatment by other inmates in that unit. Defendant argues that plaintiff's claims are meritless, and even if plaintiff could succeed in proving his retaliation claim, that defendant would have taken the same action in the absence of plaintiff's protected activity due to legitimate penological interests. The court will address plaintiff's federal constitutional claim first, before turning to his state negligence claim.

I.  **First Amendment Retaliation Claim**

In order to establish a First Amendment retaliation claim, a plaintiff must allege that: (1) he engaged in activity protected by the First Amendment; (2) the defendant took

an adverse action that would deter a person of "ordinary firmness" from engaging in the protected activity; and (3) the First Amendment activity was at least a "motivating factor" in the defendant's decision to take that action. *Whitfield v. Spiller*, 76 F.4th 698, 707-08 (7th Cir. 2023); *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). If the plaintiff makes this showing, the burden shifts to the defendant to show that he would have taken the same action even without the retaliatory motive. *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011).

The parties do not dispute that plaintiff's filing of a PREA complaint and inmate complaints against defendant would both constitute speech protected by the First Amendment, so the court will assume his grievances were protected, at least for purposes of summary judgment. *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020). In the context of a First Amendment retaliation claim, the Seventh Circuit has also defined the kinds of actions that count as "adverse" somewhat broadly. *See Mosely v. Bd. of Educ.*, 434 F.3d 527, 534 (7th Cir. 2006) (holding that adverse actions can be "any deprivation under color of law that is likely to deter the exercise of free speech . . . [that] need not be great in order to be actionable.") (citations omitted).

However, prisoners are necessarily subjected to "harsher conditions and environments than ordinary citizens[,]" *Holleman*, 951 F.3d at 882, and the Constitution sometimes permits greater restriction of one's First Amendment rights in a prison than it would allow elsewhere. *See Beard v. Banks*, 548 U.S 521, 528 (2006). Further, the court must apply an objective test when determining whether the alleged conduct by defendant would likely deter a person of ordinary firmness from continuing to engage in protected

12

activity. *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020) (citing *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011)). Finally, when considering a retaliation claim, the court must "afford appropriate deference and flexibility to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996). In particular, the Seventh Circuit has cautioned courts against "excessive judicial involvement in day-to-day prison management" and held that prison officials are owed deference "when responding to grievances and maintaining order in a volatile environment," as well as to the justifications they offer for their decisions. *Holleman*, 951 F.3d at 880 (citations omitted). Ultimately, judges are not "super-wardens who sit to critique the efficacy or wisdom of prison management choices." *Id*. Under this standard, each of the actions plaintiff now argues were retaliatory falls well short of the mark.

## A. Unit Assignment

First, plaintiff contends that his transfer from Unit 1 to Unit 5 was an adverse action that defendant took in retaliation for his filing of a PREA complaint. However, any disruption caused by a transfer to a different facility or unit does not make an inmate's transfer adverse, at least on its own. *Holleman*, 951 F.3d at 882. In particular, absent an "additional aggravating factor, such as relocation to a much more restrictive or dangerous environment," a change in a prisoner's housing assignment is not likely to deter a person of ordinary firmness from continuing to engage in protected conduct; and a transfer that "objectively improves the prisoner's condition" would obviously not do so either. *Id*. at 881-82.

Here, plaintiff has provided *no* evidence permitting an objective officer to infer that Unit 5 presented a more restrictive or dangerous environment than the unit from which he was transferred, at least without the benefit of hindsight.  Even viewing the facts in the light most favorable to plaintiff, a reasonable jury could find, at most, that an objective officer might believe plaintiff was required to live with an inmate who had fought with his former cellmate.  However, even if this were an actionable decision, there is no evidence that plaintiff was even required to live with the inmate who had threatened to hit his new cellmate with his cane.  Thus, based on the evidence at summary judgment, a reasonable jury could not find that plaintiff's assignment to Unit 5 was more dangerous than Unit 1 that it would deter a person of "ordinary firmness" from engaging in protected speech; indeed, plaintiff himself filed at least two inmate complaints involving defendant *after* he had been moved.  To the contrary, given the advantages offered even non-veterans on Unit 5, a much stronger case could be made that plaintiff's transfer to that unit was *more* favorable than leaving him on Unit 1.

Even assuming that a jury could view plaintiff's transfer as an adverse action, plaintiff has identified no evidence that would support a finding that his transfer was retaliatory.  Although the email identifying plaintiff as a candidate for a transfer into Unit 5 does mention his relationship with a Unit 1 social worker against whom he filed a PREA complaint, that complaint itself does *not* appear to have been discussed by defendant or any other correctional officer involved in the transfer decision.  Moreover, removing the PREA complaint from the picture, defendant points out that an objective correctional officer at Stanley would still have had ample reason to move plaintiff out of Unit 1, given

the strong penological interest in separating him from a female prison staffer with whom he had behaved inappropriately. While plaintiff may disagree with that contention (and even with defendant's assertion that he behaved inappropriately towards the female prison staffer), a reasonable jury would have to find that defendant's administrative justification for plaintiff's move -- that there were not enough veteran inmates to fill the veterans' wing in Unit B -- in conjunction with the apparent need to move a Unit 5 inmate and plaintiff's problematic relationship with a Unit 1 social worker is ample grounds to conclude his PREA complaint was not material to his move from Unit 1 to Unit 5.

Finally, plaintiff's only direct evidence of retaliation -- a hearsay statement by a non-party Stanley correctional officer that plaintiff was "being fired and transferred to Unit 5 Wing B" -- is simply not probative of his claim, even when viewed in the light most favorable to plaintiff, nor is it likely to be admissible evidence at trial. And the sole case upon which plaintiff relies for his argument that his unit transfer was an adverse action, *Gomez v. Randle*, 680 F.3d 859 (7th Cir. 2012), is inapposite insofar as it simply applied a pleading standard for a retaliation claim at the screening stage. Although that case does stand for the contention that a prison transfer *could* deter First Amendment activity, the district court in *Gomez* lacked the robust evidentiary record the court has before it here.[9]

---

[9] Plaintiff did not develop his argument that the Stanley reclassification panel's refusal to move him to Racine Correctional Institution on October 1, 2019, also constituted an actionable deprivation. (*See* dkt. #74, at 41.) Generally speaking, "[p]erfunctory and undeveloped arguments are waived[.]" *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016). Moreover, while a decision to transfer an inmate -- or, by extension, a decision *not* to transfer him -- that is made with a retaliatory motive *can* violate a prisoner's First Amendment rights, *Holleman*, 951 F.3d at 881, plaintiff has provided no admissible evidence to suggest that the panel had such a motive here.

B. **Prison Employment**

Plaintiff also claims that losing his job in Unit 1 after his transfer to Unit 5, being offered a replacement position in Unit 5, and receiving a promotion in his replacement job shortly thereafter all constituted adverse actions. Certainly, "relatively minor personnel actions" can chill First Amendment activity for public employees, but prison work assignments are not subject to the same standard. *Douglas*, 964 F.3d at 647-48. Even if inmates draw wages from their jobs in prison, the purpose of prison work assignments remains penological. *Id*. Accordingly, a prisoner needs to show a "concrete difference" between the position he held and the "less desirable" position he was transferred to, whether in pay, working conditions, or side benefits. *Id*. (citing *Gustafson v. Jones*, 117 F.3d 1015, 1021 (7th Cir. 1997); *Spiegla v. Hull*, 371 F.3d 928, 941 (7th Cir. 2004)).

In this case, there is *no* "concrete difference" between the roles plaintiff held in Unit 1 and Unit 5, and certainly not one giving rise to an actionable retaliation claim. To begin, plaintiff complains that after he was involuntarily transferred to Unit 5, defendant provided him with a job that initially paid him the *same* amount -- and after he was promoted less than two months later, *actually paid more* -- than the job he previously held. Nor is there any evidence to suggest that plaintiff's new job was more dangerous, less stable, or otherwise materially worse than the job he held in Unit 1.

Indeed, aside from his own description, the only evidence to support plaintiff's claim that he was in danger while working in a position ordinarily intended for veterans but available for all in Unit 5 is a so-called "expert opinion" by his "close personal friend" that plaintiff experienced a "hostile environment" because other inmates believed he was a

16

"snitch." (Adamski Decl. (dkt. #63) ¶¶ 5-6.)  Of course, plaintiff's friend is not an expert in the sense contemplated by Fed. R. Evid. 702, and plaintiff cannot rely on testimony "supported by only speculation or conjecture." *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (citation and quotation marks omitted).

Even if plaintiff could show that his work environment in Unit 5 was *materially* worse, he also failed to proffer any evidence suggesting that his loss of employment in Unit 1, his new job in Unit 5, and his promotion in Unit 5 were retaliatory.  First, plaintiff has not adequately disputed that inmates who transfer to another unit generally cannot maintain their previous work assignment, given the security concerns created by travel between units.  (Dkt. #74, at 18.)  Second, there is no evidence from which a jury could reasonably infer that defendant's efforts to help plaintiff secure employment in Unit 5 were intended to retaliate for his PREA complaint; indeed, the undisputed facts establish that Drost actually *assisted* plaintiff in promptly obtaining a new, comparable-paying job in Unit 5, so he could avoid being paid at a lower, INUVA rate.  Third, given plaintiff's decision to file two inmate complaints against defendant *after* he was moved to Unit 5 and started his new job, he was plainly not deterred from engaging in additional conduct protected by the First Amendment.  Fourth, and finally, even viewing the facts in the light most favorable to plaintiff, no reasonable jury could find that the circumstances surrounding his employment after being moved to Unit 5 -- including being terminated from his job in Unit 1, offered a comparably paid job in Unit 5, and promoted shortly thereafter -- state an actionable retaliation claim, especially having offered *zero* evidence that defendant Drost

was responsible for, much less had reason to foresee, plaintiff being labelled a "snitch" following his transfer or receipt of a new job.

### C. Phone and Mail Monitoring

Finally, plaintiff claims that he was subjected to a deprivation that would deter future First Amendment activity by being subjected to enhanced monitoring of his prison phone calls and mail correspondence. Unreasonable restrictions on a prisoner's telephone access can violate the First Amendment. *Tucker v. Randall*, 948 F.2d 388, 391 (7th Cir. 1991). However, where a prison provides notice than an inmate's calls are monitored, he cannot have a reasonable expectation of privacy in those communications. *United States v. Sababu*, 891 F.2d 1308, 1329 (7th Cir. 1989). Similarly, inmates have a First Amendment right to send and receive mail, *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989), but that right does not preclude prison officials from reviewing or censoring most inmate mail. *Wolff v. McDonnell*, 418 U.S. 539, 575-76 (1974). Rather, apart from "legal mail" between an inmate and his attorney, which is considered confidential, *Guajardo-Palma v. Martinson*, 622 F.3d 801, 802-05 (7th Cir. 2010), inspection of an inmate's personal mail for contraband is a legitimate penological practice. *Wolff*, 418 U.S. at 575-76. If anything, in prisons, "official surveillance has traditionally been the order of the day." *Sababu*, 891 F.2d at 1329 (quoting *Lanza v. New York*, 370 U.S. 139, 143 (1962)).

Thus, plaintiff's claim that the act of monitoring his phone calls and prison mail constitutes an actionable deprivation for purposes of a First Amendment retaliation claim fails as a matter of law, particularly where plaintiff (1) concedes that he was generally aware his phone calls and mail at Stanley would be monitored; and (2) provides no evidence to

suggest he was subject to enhanced phone or mail monitoring, again aside from his own speculation or doubt, inadmissible hearsay attributed to non-party, correctional officers in declarations by fellow inmates, neither of which is sufficient to prove a constitutional violation. *See Schindler v. Seiler*, 474 F.3d 1008, 1010-11 (7th Cir. 2007).

Because no reasonable jury could find that plaintiff was subject to *any* adverse action for filing his PREA complaint or his other prisoner complaints -- or in the alternative, could find defendant lacked a legitimate penological interest for taking the actions that he did -- defendant is entitled to summary judgment on plaintiff's First Amendment retaliation claim.

## II. Exercise of Supplemental Jurisdiction over Plaintiff's State-Law Claim

That leaves plaintiff's state-law negligence claim against defendant for transferring plaintiff from Unit 1 to Unit 5. Under Wisconsin law, a negligence claim "requires the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages." *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860. The court will exercise supplemental jurisdiction over this claim because it arises from the same set of facts as plaintiff's retaliation claim against Drost, and it would make little sense for a state court to expend resources on plaintiff's negligence claim. 28 U.S.C. § 1367(a).

When deciding whether to exercise supplemental jurisdiction, a federal court "should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *See City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343,

19

350 (1988)).  For the reasons discussed above, plaintiff cannot prove that he suffered any "actual loss" arising from his transfer into Unit 5, let alone suffered damages.  *Hornback v. Archdiocese of Milwaukee*, 2008 WI 98, ¶ 16, 313 Wis. 2d 294, 752 N.W.2d 862.  Even if he could, plaintiff has not shown any basis for a reasonable jury to find the individual defendant here, Unit Manager Drost, had reason to foresee that plaintiff would be labeled as a "snitch" in his new unit.  Without that showing, plaintiff cannot prove defendant breached his duty of care towards him.  *Id*. at ¶ 21.  Because plaintiff's state-law claim also necessarily fails, exercising jurisdiction over plaintiff's state-law claim here serves the interests of judicial efficiency.  Accordingly, defendant Drost is entitled to summary judgment on plaintiff's negligence claim as well.

## ORDER

IT IS ORDERED that:

1) Defendant's motion for summary judgment (dkt. #52) is GRANTED and final judgment shall be entered against plaintiff Rowell.

2) The clerk of court is directed to enter final judgment.

Entered this 16th day of January, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge